128                                    54 Mass. App. Ct. 128 (2002)

DiCerbo *v.* Commissioner of the Department of Employment and Training.

ELLEN DICERBO & others[1] *vs.* COMMISSIONER OF THE
DEPARTMENT OF EMPLOYMENT AND TRAINING.[2]

No. 98-P-1127.

Suffolk. November 19, 2001. - March 6, 2002.

Present: PORADA, KAPLAN, & GILLERMAN, JJ.

*Department of Employment and Training. Employment,* Termination, Sever-
ance agreement. *Employment Security,* Eligibility for benefits. *Practice,
Civil,* Class action.

The receipt by the plaintiffs, who were employees that had been discharged as
a result of a reduction in force, of a transitional financial support option
(TFSO) financial and benefits package upon the terms described in the
TFSO agreement did not constitute receipt of separation pay or continua-
tion pay, such as would disqualify any recipient from receiving unemploy-
ment insurance benefits under G. L. c. 151A, § 1(r)(3). [132-136]

In a civil action brought by discharged employees against the Department of
Employment and Training (department) to overturn the department's ruling
that receipt of a separation package disqualified the plaintiffs from receiv-
ing unemployment insurance benefits, the judge did not abuse his discre-
tion in certifying a class of plaintiffs, but this court declined to rule whether
the court should have disallowed the motion of a particular individual to
intervene as the class representative on the ground that he failed to seek
either a timely administrative appeal or judicial review of the denial of his
claim. [136]

A civil action brought by discharged employees against the Department of
Employment and Training (department) to overturn the department's ruling
that receipt of a separation package disqualified the plaintiffs from receiv-
ing unemployment insurance benefits was not barred by the sovereign im-
munity doctrine. [136-137]

[1]Barbara Young, Ellen Smith, Clarissa Venditelli, Marcia Santos, Matthew
Austin, Ramon Chavez, and Ben Root (intervener).

[2]Effective July 1, 1996, several years after the complaint was filed, the
Department of Employment and Training became known as the Division of
Employment and Training and headed by an official titled the deputy director.
See G. L. c. 23, §§ 1-3, as amended by St. 1996, c. 151, §§ 111, 112; G. L.
c. 151A, § 1(e1/2), as amended by St. 1996, c. 151, § 449; St. 1996, c. 151,
§ 690. Although the plaintiffs made a motion in the trial court to reflect these
changes, that motion appears not to have been formally acted upon. For
convenience we shall refer to the defendant (and the agency) as originally
identified in the complaint.

CIVIL ACTION commenced in the Superior Court Department on October 18, 1993.

The case was heard by *John C. Cratsley, J.*

After remand by this court to the Superior Court, the case again was heard by *John C. Cratsley, J.*

*Andrew Kisseloff (Vida K. Berkowitz, Allan G. Rodgers, & James Breslauer* with him) for the plaintiffs.

*John E. Bowman, Jr.,* Assistant Attorney General, for the defendant.

GILLERMAN, J. The plaintiffs commenced this action on October 18, 1993, on behalf of themselves individually, and as a class action. See Mass.R.Civ.P. 23, 365 Mass. 767 (1974). Certification of a proposed class was denied on February 21, 1995. The action continued on behalf of the named plaintiffs; later, there was a certification of a newly defined class, as described below.

The principal questions presented on appeal are whether the Department of Employment and Training (department) had correctly concluded that certain plaintiffs, former employees of Digital Equipment Corporation (Digital) who were discharged as a result of a reduction in force between 1990 and 1993, were disqualified from receiving unemployment insurance benefits, and, if the department was in error, whether the plaintiffs' later motion for the intervention of Ben Root as the representative of a proposed new class of claimants, and for the certification of that class, was properly allowed.

1. *Case history.* Following a jury-waived trial on stipulated facts, a final judgment was entered in the Superior Court on February 10, 1998, disposing of numerous issues presented by the parties and declaring, insofar as material to this appeal, that the department was in error in ruling that unemployment benefits were unavailable to the former Digital employees because of their receipt of Digital's separation package referred to below. The final judgment also ordered further proceedings to identify and pay those persons who were denied benefits for the above reason but were otherwise entitled to them. See note 14, *infra.*

The department appealed solely from the portion of the final judgment declaring that the separation package (referred to as

the transitional financial support option, or "TFSO," the material provisions of which are described *infra*) paid to the discharged plaintiffs did not constitute disqualifying "remuneration" under G. L. c. 151A, § 1(*r*)(3).[3] As an alternative basis for their position, the plaintiffs cross-appealed from that provision of the judgment declaring that the decision of this court in *White* v. *Commissioner of Dept. of Employment and Training*, 40 Mass. App. Ct. 249 (1996), discussed below, may not be given "retroactive" effect. No other issues were presented on appeal.

---

[3]Paragraph (3) of § 1(*r*) currently defines the following as disqualifying "remuneration" for purposes of eligibility for unemployment compensation: under clause (1) of the paragraph, consideration received by an individual "from his employing unit for services rendered to such employing unit"; and, under clause (3), consideration received "as termination, severance or dismissal pay, or as payment in lieu of dismissal notice." G. L. c. 151A, § 1(*r*)(3), as amended through St. 1993, c. 19, § 47.

The statutory history of clause (3) of § 1(*r*)(3) has been turbulent. As appearing in St. 1953, c. 635, § 1, clause (3) included as disqualifying "remuneration" the receipt of "severance payments" or "dismissal pay." The Legislature, by St. 1957, c. 632, *deleted* those last two phrases and substituted the phrase "payment in lieu of dismissal notice." See *Bolta Prods. Div., Gen. Tire & Rubber Co.* v. *Director of Div. of Employment Security*, 356 Mass. 684, 688-690 (1970) (receipt of "severance payments" did not fall within "payment in lieu of dismissal notice" and therefore was not disqualifying event). This last phrase — "payment in lieu of dismissal notice" — was carried forward in St. 1976, c. 473, § 3. Contrast *Itek Corp.* v. *Director of Div. of Employment Security*, 398 Mass. 682, 684-685 (1986) (holding that "salary continuation plan" paid to "employees on inactive status" constituted disqualifying remuneration under clause [1] of § 1[*r*][3]).

The 1992 statutory change, see St. 1992, c. 118, § 4, effective for claims filed after September 6, 1992, restored, in clause (3), to the definition of "remuneration" the phrase "termination, severance or dismissal pay," thereby restoring language used prior to 1957. Finally, St. 1993, c. 19, § 47, provided that clause (3) "shall only be applicable to those claims filed on or after March seventh, nineteen hundred and ninety-three." The 1993 statute became effective March 9, 1993.

The evident effect of this sequence of statutory changes is that "severance pay" was not a disqualifying event between 1957 and September 6, 1992. For claims filed between September 6, 1992, and March 7, 1993, "severance pay" was a disqualifying event, but as of March 9, 1993, "severance pay" was a disqualifying event only as to claims filed after March 7, 1993.

The defendant acknowledges in its brief that "most TFSO claimants filed their unemployment claims before March 1993." In any event, for the reasons described below in our discussion of *White* v. *Commissioner of Dept. of Employment and Training*, 40 Mass. App. Ct. 249 (1996), the TFSO package was not "severance pay."

In this court, at the oral argument on November 18, 1999, threshold questions arose as to whether the controversy had become moot. Following oral argument, the parties agreed upon the need to expand the record on appeal, and they filed a joint motion to remand the case to the Superior Court. We allowed the motion, accepting the parties' identification of three issues to be decided on remand, which we set out in the margin,[4] and we entered a remand order on December 2, 1999, retaining jurisdiction of the case.

Upon remand to the Superior Court, the plaintiffs, on August 7, 2000, intending to respond to the remanded issues, moved to bring in two new plaintiffs, Ben Root and Robert Soler, and for class certification of two classes, Class A and Class B, with Root and Soler, respectively, as class representatives of the two new classes. Class A plaintiffs were defined in essence as those persons who were separated from the employ of Digital under the terms of the TFSO agreement, and who applied for, and were denied, unemployment insurance benefits. Class B plaintiffs were those persons who were terminated pursuant to the TFSO agreement, but "who were directly or indirectly discouraged from filing claims for UI benefits prior to March 7, 1993."

The judge's memorandum and order dated August 15, 2001, allowed the motion as to Root and Class A, and denied the motion as to Soler and Class B. In his order certifying Class A, the judge referred to the final judgment he had previously entered; he wrote, "the participation of Class A was obviously contemplated by this Court."[5] The plaintiffs did not claim an

---

[4]The issues to be determined on remand, as described by the agreement of the parties, were (i) whether the Superior Court had authority to order the department to pay retroactive benefits to persons whose unemployment claims were denied and not appealed; (ii) whether any named plaintiff who had received a TFSO package filed a claim after March 7, 1993 (see note 3, *supra*), and if not, whether relief is available to members of the TFSO group filing claims after March 7, 1993; and (iii) the timing of the filing of unemployment claims by TFSO group members, as well as whether additional members of the TFSO group might move to intervene as plaintiffs, and whether a motion for certification of a class of persons consisting of the TFSO group might be filed.

[5]The judge understandably took the plaintiffs' motion for the intervention of the two new class representatives, and the certification of the two new classes, as presenting the substantive issues identified in the joint remand motion. See note 4, *supra*.

appeal from the denial of the certification of Class B.

In a supplementary order dated September 27, 2001, follow-
ing the judge's decision just described, we limited the parties'
supplementary briefs, to be filed for reargument, to the two is-
sues decided by the judge following remand, namely, the allow-
ance of the plaintiffs' motion to permit the intervention of Ben
Root, together with the certification of Class A (with Root as
representative) on the ground that the receipt of the TFSO pack-
age was not a disqualifying event for the receipt of unemploy-
ment benefits; and the disallowance of the plaintiffs' motion to
permit the intervention of Robert Soler and the certification of
Class B. The plaintiffs have abandoned their motion insofar as
it deals with Soler and Class B, and we proceed to discuss the
merits of this controversy.[6]

2. *Discussion.* We consider first the certification of Class A,
as described in the plaintiffs' motion for certification of a revised
class: "Those persons who were laid off by Digital Equipment
corporation, pursuant to the Transitional Financial Support Op-
tion (TFSO) separation agreement, applied for Unemployment
Insurance (UI) benefits prior to the end of their TFSO payments
period and were denied UI benefits by the [department]
. . . ."[7]

The TFSO package did not, as the department argues,
constitute disqualifying "continuation pay" within the holding

---

[6]The judge decided not to follow precisely the original description of the is-
sues to be decided upon remand. See note 5, *supra.* Neither party, by a motion
for reconsideration in the Superior Court, sought to expand or modify the
scope of the judge's decision to conform to the issues as originally described
by the parties. Further, our decision to accept the judge's supplementary deci-
sion as the basis for our review is supported by the department's reply to the
plaintiffs' second status report, dated September 28, 2001 (one day following
the date of our supplementary order confining supplementary briefs to the is-
sues decided by the judge following remand), wherein the department states
that "[t]he plaintiffs do not make any showing why further proceedings before
the Superior Court on remand are necessary or why such proceedings would
aid this Court in the exercise of its retained jurisdiction over the pending ap-
peal, as set forth in its December 2, 1999 Order . . . . [T]he case should be
returned to [the Appeals] Court now."

[7]The balance of the text reads, "or after appeal, but excluding those persons
who also filed or reopened a claim for UI benefits after the end of their TFSO
payments period and received the same amount of UI benefits they would
have received if their initial UI application had been approved."

of *Itek Corp.* v. *Director of Div. of Employment Security*, 398 Mass. 682 (1986). In *Itek*, the company's plan for the benefit of discharged employees kept them on the company payroll with payment of salary, at the regular intervals, *following* termination for a period of months determined by reference to the employee's length of service with the company. *Id.* at 683. Additionally, the salary payments "would cease if the employees were to find other employment within a certain time span." *Id.* at 685. The court referred to the arrangement as a "salary continuation plan," that is, a plan for the continuation of salary, without any current services being rendered to the company, during a predetermined period and in consideration of services rendered in the past. *Ibid.* The plan was held, under clause (1) of § 1(r)(3), see note 3, *supra*, to be disqualifying remuneration to the employee because it was consideration received by an individual "from his employing unit for services rendered to such employing unit." *Id.* at 686, quoting from G. L. c. 151A, § 1(r)(3)(1). This consideration for services rendered in the past represented "an acknowledgment by the employer of the employee's faithful performance of his duties." The court also wrote that the "Legislature did not intend that unemployment compensation serve as a supplemental income for those receiving their regular salaries." *Ibid.*

In the case before us, employment terminated on the date of the TFSO agreement; the monies received by the discharged employees under the TFSO package were to be paid "as soon as reasonably feasible" in one lump sum in an amount based in part on the employee's years of continuous service, and were due regardless of whether or when the discharged employees found new employment. There were no provisions for any further services, or for the continuation of salary or other periodic cash payments. Unlike that in *Itek*, the payment here was not paid out like salary, nor was it designed to be paid out during the period of unemployment. The TFSO package could not be described as a "salary continuation plan."

A quite separate point is decisive. The discharged employees were informed by memorandum (the caption read, "SUBJECT:

INVOLUNTARY REDUCTION IN FORCE — EMPLOYEE NOTICE") that "[i]n order to receive the benefits under TFSO, you will be required to sign the Transition Financial Support Agreement, a copy of which is also enclosed . . . . *Failure to sign the TFSO Agreement and return it, postmarked no later than SEPTEMBER 25, 1992, will result in the termination of your employment without the benefits*" (emphasis added).

The TFSO agreement provided in careful detail that acceptance of the TFSO package constituted "full and complete satisfaction" of all claims the employee then had, or ever had, against Digital and all "its officers, directors, agents, successors, assigns or employees." The TFSO agreement then stated that the "effect" of signing the agreement was "to prevent [the] Employee from suing" any of the parties released, whether under the common law or under any State, Federal or local law (many of which are identified in the agreement), or "any other claim arising out of [the] Employee's employment with Digital or termination of employment."

In this respect, the case before us presents the same facts as those appearing in the decision of this court in *White* v. *Commissioner of Dept. of Employment & Training*, 40 Mass. App. Ct. 249 (1996) — although there was no class action in *White*. *White* involved the same TFSO package as is involved in this case:[8] a lump sum payment based in part on the employee's years of service with Digital; continued medical, dental, and life insurance during the relevant period; and the condition that the employee would receive nothing unless he signed a general release of all claims.[9]

Relying on *Moore* v. *Digital Equip. Corp.*, 868 P.2d 1170 (Colo. Ct. App. 1994), which involved an "almost identical" TFSO package, we held in *White* that the cash payment and insurance benefits were not made in return for past services, but in return for the general release of all claims, with the result that the employee accepting the TFSO package and signing the

---

[8]The department makes no claim that Digital's TFSO package in the *White* case was different from Digital's TFSO package in this case.

[9]It appears that the plaintiff in the *White* case filed his claim for benefits *after* March 7, 1993. See *White* v. *Commissioner of Dept. of Employment & Training*, 40 Mass. App. Ct. at 250.

general release did not thereby receive disqualifying payments. *White* v. *Commissioner of Dept. of Employment & Training, supra* at 252-254. More particularly, we wrote that in *Moore* "the employee's consideration for the agreement was not services[,] but the release of any claim that he might have against 'the employer itself or against described third parties,' or, as provided in the agreement before us, [Digital's] officers, directors, agents, successors, assigns or employees." We added that "the primary purpose of such payment [under the TFSO] is to obtain such release." *White* v. *Commissioner of Dept. of Employment & Training, supra* at 254, quoting from *Moore* v. *Digital Equip. Corp., supra* at 1173. Had Digital's primary purpose been to provide a salary substitute, the payment "would not have been conditioned on the employee's execution of the written release." *White* v. *Commissioner of Dept. of Employment & Training, supra* at 253, quoting from *Moore* v. *Digital Equip. Corp., supra* at 1172. For these reasons, the TFSO package did not, as the department argues and as the Superior Court declared, constitute "severance pay." (See note 3, *supra*, for a description of the limited statutory periods during which "severance pay" was a disqualifying event).

The plaintiffs argue that the *White* decision should be given "retroactive effect"; the department insists it should not. The parties have carefully briefed the question, but we need not undertake a discussion of that complex issue.[10] We see no sound basis for departing from the reasoning and conclusion we reached in *White*, and we decline to do so.[11] The circumstances and the contractual arrangements in the *White* case and in the case before us are substantially identical. In *White*, there was no controlling authority; in this case we have the controlling author-

[10]By way of illustration, judicial changes in contract and property law generally have been given only prospective effect. See *Payton* v. *Abbott Labs*, 386 Mass. 540, 565 (1982). Contrast *McCarthy* v. *Litton Indus., Inc.*, 410 Mass. 15, 25-26 (1991) (observing that "the general rule is in favor of retroactive application of a change in decisional law" [quoting from *Payton* v. *Abbott Labs, supra*] and applying rule to tort claim).

[11]We note also that the failure to follow *White* would work a substantial injustice for some 1800 former Digital employees who, we were informed by the department at the oral argument, had received a TFSO package and consequently were determined by the department to have received disqualifying compensation.

ity of *White*, and as it is a well-reasoned decision, we will follow it.

We hold that the receipt of a TFSO financial and benefits package upon the terms described in the TFSO agreement did not disqualify any recipient from receiving unemployment insurance benefits.

We turn to the allowance of the motion to intervene. The department makes several arguments regarding the judge's decision, after remand, to allow the intervention of Ben Root as the class representative of Class A members. The nub of the objection to Root is that he did not seek either a timely administrative appeal or judicial review of the denial of his claim.[12] At an evidentiary hearing upon the return of the case to the Superior Court, see *infra*, it may appear that Root is vulnerable on that basis, and the department's point may not be lost. Should that occur, however, the plaintiffs would be allowed to substitute a new, qualified, class representative. Compare *Cleary* v. *Commissioner of Pub. Welfare*, 21 Mass. App. Ct. 140, 147 (1985).[13] We see no abuse of discretion in the judge's certification of the class. See *Weld* v. *Glaxo Wellcome Inc.*, 434 Mass. 81, 84-85 (2001).

The department's supplementary brief makes a brief reference to a bar presented by "the sovereign immunity doctrine." We address the point briefly. The doctrine "protects the public treasury against money judgments and public administration from interference by the courts at the behest of litigants except

---

[12]The department cites *Doe* v. *The Governor*, 381 Mass. 702, 705-707 (1980), wherein a complaint seeking declaratory relief to remedy deficiencies in the Commonwealth's services for abused and neglected children was held to be defective for the failure to allege any specific grievance of individual plaintiffs. The Supreme Judicial Court directed that the plaintiffs be given leave to file an amended complaint in the Superior Court.

[13]Furthermore, as the judge wrote, citing *Peabody Fedn. of Teachers, Local 1289, AFT, AFL-CIO* v. *School Comm. of Peabody*, 28 Mass. App. Ct. 410, 413 (1990), a motion to intervene a new class representative is not necessarily untimely when filed after a final judgment. A transactionally related amendment to the complaint relates back to the date of the filing of the complaint, see Mass.R.Civ.P. 15(c), 365 Mass. 761 (1974), and, as to putative class members who wish to intervene, the statute of limitations is tolled upon the filing of the complaint. See *American Pipe & Constr. Co.* v. *Utah*, 414 U.S. 538, 554 (1974). See also *Crown, Cork & Seal Co.* v. *Parker*, 462 U.S. 345, 353-354 (1983).

in instances and by procedures the Legislature has authorized," *New Hampshire Ins. Guar. Assn.* v. *Markem Corp.*, 424 Mass. 344, 351 (1997), but the doctrine has no application to the facts of this case.

The unemployment benefits system is funded by contributions from covered employers which are paid into the Commonwealth's Unemployment Compensation Fund, G. L. c. 151A, § 48, and all such contributions must be deposited "immediately with the secretary of the treasury of the United States of America to the credit of the account of the commonwealth in the Unemployment Trust Fund." G. L. c. 151A, § 50. The State treasurer has the power to requisition funds from the Unemployment Trust Fund for the payment of benefits. G. L. c. 151A, § 51. Under Federal law, a State's unemployment compensation system must ensure "full payment of unemployment compensation when due." 42 U.S.C. § 503(a)(1). Inconsistent State practice must yield to this Federal "when due" clause. See *California Dept. of Human Resources Dev.* v. *Java*, 402 U.S. 121, 129-133 (1971). Like the enforcement provisions of 42 U.S.C. § 1988, for reasonable attorney's fees in certain cases, the Federal statute just described is designed to "overcome any inconsistent claim that a State official, as defendant, may advance under the banner of the sovereign immunity of the State." *Gaulin* v. *Commissioner of Pub. Welfare*, 23 Mass. App. Ct. 744, 747, *S.C.*, 401 Mass. 1001 (1987).

For the foregoing reasons, paragraph 5 of the final judgment (declaring that a TFSO package does not disqualify a recipient from receiving unemployment benefits) shall be modified to reflect that the TFSO package constituted neither separation pay not continuation pay and, as so modified, is affirmed. Paragraph 7 of the final judgment (declaring that *White* v. *Commissioner of Dept. of Employment and Training*, 40 Mass. App. Ct. 249 [1996], "does not have retroactive effect to the members of the TFSC group") is vacated as unnecessary to the determination of the parties' rights. Paragraph 6 of the final judgment (ordering the defendants, in cooperation with the plaintiffs, to proceed with the implementation of the approved class action), is affirmed along with the balance of the judgment. The case is remanded to the Superior Court for further proceedings in ac-

cordance with this opinion and with paragraph 6 of the final judgment, the text of which appears in the margin.[14]

*So ordered.*

---

[14]Paragraph 6 of the final judgment reads in full as follows:

"The defendants are ordered to take prompt and reasonable steps to locate, notify, and provide the opportunity to TFSO group members who were denied unemployment benefits on the basis of their receiving continuation pay to submit information regarding their eligibility for benefits, and thereafter to pay all otherwise eligible TFSO group members unemployment compensation in accordance with their eligibility. This Court retains jurisdiction on this issue and will hold a hearing on Tuesday, July 7, 1998, at 2 p.m. in the Suffolk C Session to review, in the case of claims of members of the TFSO group, plans for identifying and locating members whose unemployment claims were denied, giving them written notice of their eligibility and affording them prompt decisions and payment of benefits to which they are entitled. The parties will confer and make good faith efforts to reach agreement on such implementation plans."

We note that the scheduled date of the hearing, as it now appears in paragraph 6, will have to be revised by the judge.